NOT DESIGNATED FOR PUBLICATION

No. 121,005

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Equalization Appeal of
CITY OF COUNCIL GROVE,
for the Tax Years 2014, 2015, and 2016 in Morris County, Kansas.

MEMORANDUM OPINION

Appeal from Board of Tax Appeals. Opinion filed June 19, 2020. Reversed and remanded.

*Linda Terrill*, of Property Tax Law Group, LLC, of Overland Park, for appellant City of Council Grove.

*Michael A. Montoya*, of Michael A. Montoya, P.A. of Salina, for appellee Morris County.

Before STANDRIDGE, P.J., ATCHESON, J., and BURGESS, S.J.

PER CURIAM: The City of Council Grove (City) appeals the valuation by Morris County (County) of land owned by the City. We find that the appraiser hired by Morris County to evaluate the land failed to take statutorily mandated factors into account when conducting the appraisal. We reverse the Board of Tax Appeals' (BOTA) affirmation of the valuation of the City property and remand for further proceedings.

When determining fair market value "[s]ales in and of themselves shall not be the sole criteria of fair market value but shall be used in connection with cost, income and other factors." K.S.A. 79-503a. Other factors that shall be used include productivity, rental values, and restrictions or requirements that are imposed by local governing bodies. K.S.A. 79-503a(f), (h), (j).

1

The City owns the Council Grove City Lake (Lake) which serves as the main water source for the City. The City leases the land surrounding the Lake to individuals which grant lessees access to the Lake. The leases impose some restrictions on the lessees including certain actions that might affect the City's water supply. Lessees have the ability to mortgage the land and to build homes on the land. The lease sets rent and provides for how the rent can increase year-to-year. The lease is in effect for 30 years and automatically renews for additional 30-year terms forever.

The County hired an appraiser to determine the fair market value of the Lake for tax purposes. The appraiser did not use the rent, as set by the leases, to determine the fair market value of the Lake. The City appealed the valuation to BOTA who adjusted the appraiser's valuation down but did not comment on the appraiser's failure to use the rent as set by the lease.

The City appeals BOTA's final order and decision.

FACTUAL AND PROCEDURAL BACKGROUND

This case involves the improved land surrounding the Lake. The land, and taxes involving the land, has already been addressed by this court, most recently in *In re Tax Appeal of City of Council Grove*, No. 116,414, 2017 WL 3669088 (Kan. App. 2017) (unpublished opinion).

Essentially, the Lake and the land surrounding it is owned by the City. The Lake is a source of water to the City. The City leases the land to individuals under a lease agreement that this court has previously noted was "unique and may be the only one in the State of Kansas." 2017 WL 3669088, at *1. There are 350 lots at the Lake.

2

The relevant portions of the lease agreement require the lessee to pay the City $1,000 in 2012, $1,100 in 2013, and $1,200 in 2014. The lease provides that the City may increase the rent under certain circumstances, such as a significant increase in maintenance expenses. The lease also allows the lessee to "encumber by mortgage or deed of trust . . . its leasehold interest and estate in the Leased Premises, together with all buildings and improvements on the premises . . . however such encumbrance shall be subject to the obligations of the Lessee to the City." As part of the lease, a lessee is required to "not do, or permit, anything upon the leased premises that will jeopardize the water supply of the City." Nor may a lessee use any chemicals on the leased premises without a permit from the City. The lease also prohibits lessees from pumping water out of the Lake without the approval of the City Council. Under the terms of the lease, the City passes the ad valorem taxes through to the lessee.

The lease is designed to work in a similar way for the foreseeable future. Under section 4 of the lease:

> "The term of this Lease shall expire on December 31, 2041, regardless of its commencement date. Provided, however, this Lease, upon its expiration, shall automatically renew for a period of thirty years, and shall continue to renew for successive terms of thirty years perpetually. Notwithstanding the perpetual nature of this Lease, nothing herein shall be construed as divesting Lessor of legal title to the Leased Premises."

The lease was drafted by the Council Grove City Lake Association (CGCL). At the time, the mayor advocated for charging $2,500 per lease. According to Dave Fritchen, "everyone went ballistic" over the proposed lease amount. A committee was formed to address the rent amount, with members from local businesses, Lake residents, and the City Council. The committee discussed numbers spanning from $600 to $2,500 a year and ultimately arrived at a $1,000 per year amount with a slight increase each year. Fritchen noted that the committee did not seek "a fair market rent, but part of the purpose

3

of bringing us together was the leaseholders around there were concerned about rent stability." Fritchen also agreed with counsel that "the impetus behind all this movement was to get the taxes down because they were going too high."

The fair market value of the leased land has been a source of contention between the City and the County for several years. See 2017 WL 3669088. For the 2012 tax year, this court affirmed the property valuation of just over $2.3 million and dismissed the appeal of the 2013 tax year for lack of jurisdiction. 2017 WL 2669088, at *2, 4-6. The fair market value of the land is used to determine the amount of ad valorem tax the City is required to pay. See K.S.A. 79-1439.

The County hired Keller, Craig & Associates to appraise the Lake to determine its fair market value for the tax years 2014, 2015, and 2016. Timothy Keller prepared an appraisal report for each tax year.

Keller's reports noted that the lease "was a negotiated settlement with no market rent study ever performed. There are also some legal opinions that questions whether this lease is binding. This opinion indicates that one acting City Council cannot enter into a contract binding future City Councils actions." Based on Keller's assumptions the report ignores "the below market ground leases which are in place at the subject property in the analysis for arriving at market value."

As part of the appraisal, Keller determined that the highest and best use of the property was continued use as a lake front community. Keller did not use a cost approach analysis to determine fair market value because it would be the least reliable analysis due to the "age of the property and market conditions." Instead, Keller applied an income approach to determine the fair market value.

4

According to the report:

> "Market rent is defined as the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the specified lease agreement including the rental adjustment and revaluation, permitted uses, use restrictions, expense obligations, term concessions, renewal and purchase options, and tenant improvements."

Because of the low amount paid through the current lease, Keller considered three lake land leases in the Midwest. When comparing the Lake to the other properties, Keller considered the waterfront, water view, presence of boat docks, occupancy period, lot size, and lake size. Keller's report acknowledged that the characteristics in the locations differed and adjusted the valuations accordingly. For example, two of the comparable properties had an inferior waterfront when compared to the Lake properties. Keller adjusted their rent by increasing the rent by 100% to account for the difference. But those same two properties had a larger lake, so he reduced their rent by 30% to account for the different lake sizes. It is telling that this analysis does not indicate that any of the other properties studied were owned by a municipality or that the lakes were water sources for a municipality.

Given his calculations, Keller estimated that an annual rent between $4,150 and $5,600 was appropriate. His report settled on $5,500 annually based on "the amenities that are available such as year-round availability and large sites that support permanent structures."

Keller then attempted to determine the net operating income for the Lake, using his projected $5,500 rent. Keller determined that there would be a total net operating income of $1,628,418 per year. After calculating the net operating income, Keller divided that by a capitalization rate of 7%.

He decided on a 7% capitalization rate after considering a 2013 capitalization rate study, completed by Keller's firm, in Shawnee County, Kansas. According to the study, the capitalization rate in Shawnee County for Class A properties was between 6.6% and 9%. Keller classified the Lake as a low risk investment and determined that it would fall within a Class A property. Keller determined that a 7% rate was appropriate given the type of property involved.

By dividing the net operating income by the capitalization rate of 7%, Keller determined the Lake had a market value of approximately $23,260,000.

Next, Keller used a discounted cash flow analysis to determine a second market value for the Lake. Keller determined that average similar lots sold for around $83,000. Keller also used a five- and seven-year selling period to determine two market values. Finally, Keller utilized a discounted rate of 10.5% in his calculations. After calculating the value after a five- and seven year sell out, Keller determined that the average market value between the two periods was $24,585,000.

Using the market values derived from the two approaches, Keller determined that the market value of the Lake, for tax year 2014, was $24,000,000. Using the same methods, Keller determined that the market value of the Lake for tax year 2015 was $25,000,00, and tax year 2016 was $26,000,000.

The County assessed taxes against the City using Keller's appraised fair market values. BOTA heard evidence and arguments regarding the valuation from the parties in May 2018.

Keller testified regarding his appraisals before BOTA. The City called Tom Slack, a previous member of BOTA, to testify. Slack pointed out some possible problems with Keller's report. For example, Slack explained that in the some of the reports, it seemed

like the comparable landlord was paying taxes and expenses on the leased property, without passing those costs onto the lessee. A lessee at the comparable location might be paying $3,950 for rent, but the landlord is absorbing $1,300 in taxes, "if you take the $3950 and subtract 1300, you're at $2600 net effectively passthrough." Slack called Keller's report into question, in part, because that was "not identified or explained or adjusted."

Slack also thought that Keller's report was not credible because of his adjustments to rent values based on differing amenities and features of the comparable properties. When asked about the 100% adjustment due to lake size, Slack said that it was not credible and pointed out that Keller supposedly chose the comparable properties he did because "he liked the lake sizes." Slack thought this was confusing because Keller's report had to adjust the rent so much for the lake size. Slack continued to discuss the problem, saying "when your net adjustments are 200 percent, 190 percent, 190 percent, and 100 percent, you have to ask, you know, how comparable are they if you have to double or triple the rent? Double the rent minimal." Slack also noted that Keller failed to offer any reasoning for his adjustments in his report.

Slack also took issue with Keller's classifying the Lake as Class A property for appraisal purposes. Slack thought it was unrealistic to believe that the Lake would continue to be at full capacity if rent was to jump from $1,200 a year to around $6,000 a year.

Slack also thought Keller's report incorrectly assumed that a majority of the leaseholds would transfer within five or seven years for purposes of the cash flow analysis. To buttress Slack's assertion, Gary Catlin, a realtor in Council Grove, testified on behalf of the City. According to Catlin, in an average year about 25 Lake leaseholds transfer ownership.

BOTA issued a summary decision in November 2018. The parties requested that BOTA issue a full and complete opinion. In its full opinion, BOTA briefly explained the methodology used by Keller, including Keller's assumption that there would be a five- or seven-year sell off period. BOTA also discussed Catlin's testimony that only 25 leaseholds are transferred in a typical year, leading to what would effectively be a 14-year sell off period.

BOTA found:

"Keller's discounted cash flow analysis shows that the values of the subject properties do not change appreciably whether the absorption period is five years or fourteen years. Thus, the parameters of the five- and seven-year discounted cash flow do not adapt to a discounted cash flow with a substantially longer projected sellout period."

But BOTA noted that the components in Keller's income approach, the "rental range, vacancy, expenses, inflation, and capitalization rate are supported by the evidence and reasonable."

After considering the fact that on average, only 25 leaseholds transfer in a year, BOTA determined that Keller's appraisal required modification. BOTA

"modif[ied] the annual rental rates to benchmark market amounts of $4,140, $4,400, and $4,500 for tax years 2014 through 2016, respectively. Including expense reimbursements, 1% vacancy and collection loss allowance, expenses between 37% and 39% and capitalized at 7%, yields values of $16,580,614 for 2014, $17,579,400 for 2015, and $17,657,143 for 2016."

The values were rounded and ultimately BOTA held that the value of the land was $16,581,000 in 2014, $17,579,000 in 2015, and $17,657,000 in 2016.

The City filed a petition for reconsideration. BOTA denied the petition. The City filed a timely petition for judicial review with this court.

DID BOTA ERR BY FAILING TO CONSIDER THE ACTUAL RENT PAID BY THE LESSEES?

In its first issue on appeal, the City argues that BOTA erred when it failed to consider the City and lessees have a perpetual lease in place which limits the rent that lessees will pay.

*Standard of Review*

The Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq., governs appellate review of BOTA's rulings. K.S.A. 74-2426(c); K.S.A. 77-603(a). The KJRA delineates specific circumstances under which this court may properly grant relief:  (1) the agency has erroneously interpreted or applied the law; (2) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure; (3) the agency action is based on facts not supported by the record; or (4) the agency action is otherwise unreasonable, arbitrary, or capricious. K.S.A. 77-621(c)(4)-(5), (7)-(8). Because the City is challenging BOTA's action, the City bears the burden of proving the invalidity of the action. See K.S.A. 77-621(a)(1).

To the extent this issue involves statutory interpretation, this court's review is unlimited. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015). But when construing tax statutes, provisions which impose a tax are to be construed strictly in favor of the taxpayer. *In re Tax Appeal of BHCMC*, 307 Kan. 154, 161, 408 P.3d 103 (2017).

9

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016).

*Discussion*

Kansas defines "'[f]air market value' [as] the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion." K.S.A. 79-503a. When determining fair market value, appraisals shall consider "productivity taking into account all restrictions imposed by the state or federal government and local governing bodies, including, but not limited to, restrictions on property rented or leased to low income individuals and families." K.S.A. 79-503a(f). Appraisals are also required to consider "rental or reasonable rental values or rental values restricted by the state or federal government or local governing bodies." K.S.A. 79-503a(h).

The City argues Keller's appraisal failed to consider the rent as set by the lease agreement between the City and the lessees. The City relies on two cases to support its arguments.

First, the City relies on *In re Tax Appeal of City of Council Grove*, where this court affirmed the Court of Tax Appeal's (now BOTA) ruling after the appraiser "failed to consider the long-term ground lease agreement drafted by the City." 2017 WL 3669088, at *3. As this court stated:

"The record reflects this lease agreement is governed by the City and ultimately provides the City with many benefits including the right to control and manage its major source for fresh water within the City. The City's lease agreement, entered into between the City and the CGLA, is clearly a negotiated agreement between the parties and sets rents for each

10

of the Lots at $1,000 for tax year 2012 and $1,100 for tax year 2013. [The appraiser] did not take those rates into account; thus, he failed to properly consider the factors set forth in K.S.A. 2016 Supp. 79-503a(f), (h), and (j)." 2017 WL 3669088, at *3.

Because the appraiser failed to take into account the actual rent paid, as set through the lease, this court held that COTA properly rejected part of the appraiser's valuations. 2017 WL 3669088, at *3.

The City also relies on *In re Equalization Appeal of Ottawa Housing Ass'n*, 27 Kan. App. 2d 1008, Syl. ¶ 7, 1013, 10 P.3d 777 (2000), where this court held the taxing authority erred when it did not consider the effect of low-income housing contracts when valuing the property at issue. In *Ottawa Housing*, the property being valued was an apartment complex that was built under contract with the federal government. The contract provided Ottawa Housing with tax credits, and, in return, Ottawa Housing was required to rent the apartments at a reduced rate to low-income individuals. The contract required the rent restrictions to be in place for 16 years. The county valued the apartment complex and Ottawa Housing appealed to BOTA, claiming that the valuation should be reduced because the appraisal did not consider the rent restrictions in place. BOTA disagreed and Ottawa Housing appealed.

On appeal, Ottawa Housing argued that BOTA erred by not complying with K.S.A. 79-503a. When determining fair market value, the statute required an appraisal to consider "'(f) productivity; . . . (h) rental or reasonable rental values; [and] (j) restrictions imposed upon the use of real restate by local governing bodies, including zoning and planning boards or commissions.'" 27 Kan. App. 2d at 1010-11 (quoting K.S.A. 79-503a). The county appraiser said that he did not consider the rental restrictions on the Ottawa Housing property in his appraisal. This court held it was error to not consider the low-income housing contract when determining the appraisal value of the property and remanded the case to BOTA. 27 Kan. App. 2d at 1013.

11

The question then is does K.S.A. 79-503a require Keller to consider the lease between the City and lessees, including the rent as set by the lease, and if so, did Keller's appraisal do so?

When determining the fair market value of a property, the plain language of K.S.A. 79-503a requires an appraiser to consider "productivity taking into account all restrictions imposed by the . . . local governing bodies . . . rental or reasonable rental values or rental values restricted by the . . . local governing bodies," and "restrictions or requirements imposed upon the use of real estate by the . . . local governing bodies." K.S.A. 79-503a(f), (h), (j). The lease between the City and lessees impacts productivity, sets rent, and imposes restrictions and requirements upon the use of the property. Under a plain language interpretation of K.S.A. 79-503a, Keller should have considered the lease when determining the fair market value of the Lake. See K.S.A. 79-503a.

The County argues that Keller appropriately considered the rent as set by the lease, found it wanting, and relied on other factors to determine the fair market value. But that is a generous description of what Keller did when creating his appraisal.

In his written report, Keller describes the lease as a "negotiated settlement with no market rent study ever performed." He went on to say that there are "some legal opinions that questions whether this lease is binding. This opinion indicates that one acting City Council cannot enter into a contract binding future City Councils actions." Based on this assumption, Keller "reviewed the lease and considered comparable rents of similar properties." He "ignored the below market ground leases which are in place at the subject property in the analysis for arriving at market value."

In its written opinion, BOTA did not discuss the rent as set by the lease at all. In fact, the opinion only mentions the lease in the context of describing the property.

12

Kansas law provides that to determine fair market value "[s]ales in and of themselves shall not be the sole criteria of fair market value but *shall be used* in connection with . . . other factors" such as productivity, rental values, or restrictions or requirements imposed upon the use of the property. (Emphasis added.) K.S.A. 79-503a. The City was free to encumber its property in whatever way it saw fit to manage its source of water for the city.

Whether Keller's assertion that the lease is possibly not binding is not something this court needs to, or should, address. It was not argued below and no decision was reached on the enforceability or legality of the lease.

While there is extensive evidence about the assumptions used by the appraiser and the calculations made to determine a value, this case must be decided on the appraiser's threshold refusal to consider the established rental values for the lake property. Not considering the rents as set by the lease does not conform to the statutory requirement to determine fair market value. See K.S.A. 79-503a.

Furthermore, it is totally inconsistent for the appraiser to determine a valuation or for Morris County to rely on a valuation that does not take the lake rentals into account when that issue has previously been decided in the prior case involving the same parties. This court held in that case that it was an error for the appraiser not to take those rentals into account.

Failing to even address Keller's decision to not consider the rent as set by the lease, BOTA "erroneously interpreted or applied the law." See K.S.A. 77-261(c)(4); *In re Equalization Appeal of Ottawa Housing Ass'n*, 27 Kan. App. 2d at 1011-13; *In re Tax Appeal of City of Council Grove*, 2017 WL 3669088, at *3. Keller failed to properly consider the factors set out in K.S.A. 79-503a(f), (h), and (j). BOTA did not adequately address Keller's failure in its full and complete opinion. In short, the governing statutes

13

require that the actual rents be considered in arriving at the fair market value of real property. Neither Keller nor BOTA appears to have done so. The law does not mandate that the stated rents are necessarily controlling. But we would expect an appraiser and the reviewing administrative agency to acknowledge those rental amounts and to explain what weight they have been given in arriving at a tax valuation and, especially if they have been given little weight, why. The case is reversed and remanded so that the rent—as set by the lease—is used, "in connection with cost, income and other factors" to determine the fair market value of the property. See K.S.A. 79-503a.

### WAS BOTA'S ORDER ARBITRARY, CAPRICIOUS, OR UNREASONABLE BECAUSE IT EMBRACED AN APPRAISAL THAT VIOLATES USPAP?

The City argues that Keller's appraisal did not conform with the requirements of the Uniform Standards of Professional Appraisal Practice (USPAP) because the appraisal (1) was based on a valuation of a fee simple interest subject to a lease, (2) copied older work or the work of others to determine the capitalization rate, and (3) used an impermissible assemblage method to determine the value of the property.

Keller's appraisal clearly states that he was valuating a fee simple subject to a lease. That statement is a description of the property in question and an accurate statement. However, that statement is not the basis of the process Keller used in arriving at the fee simple value of the property.

The City argues that Keller impermissibly valued the leasehold estate and added it to his leased fee valuation. It cites *In re Tax Appeal of Lipson*, 44 Kan. App. 2d 515, 238 P.3d 757 (2010), for the proposition that Kansas does not allow taxation of a leasehold estate. *Lipson* is unlike the present case. Keller's approach was consistent with a taxable values established by income approach. Keller's approach sought to determine the value of the land in question by including the value that the leases bring to the landowner.

14

The City next argues that Keller's appraisal method failed to adhere to USPAP standards because he relied on outside work or other data in his appraisal. The City claims that Keller's appraisal failed to use recognized methods and techniques in developing a capitalization rate for the appraisal when it referenced capitalization rates that his firm utilized in valuing property in Shawnee County in a previous appraisal. While the City claims, without particular support, "[c]opying outdated work or the work of others is not a recognized method or technique," the City's own expert specifically testified that Keller's process was not a USPAP violation.

Finally, the City argues that Keller used an assemblage method to determine the value of the property. The City claims that Keller determined the value of the property by dividing the property into 350 lots, calculating their market rent, and adding those values together to establish the value of the whole. Keller did divide the property into 350 lots and then calculated the value of the entire value of the property using two separate methods, direct capitalization and discounted cash flow analysis. Neither of these methods involved the process of establishing a lease value for each individual lot and adding those values together.

The highly unusual, if not unique, nature of the property and the unique interests encumbering the property opens the appraisal process to a variety of broadly reasonable professional approaches that would be consistent with the requirements of the USPAP. Some approaches might be better than others, but none probably encompass the unique situation found in this case. The utilization of these different approaches would be matters of professional judgment and, in this case, not matters of compliance or noncompliance with the USPAP. The fatal flaw with the appraisal in question is the failure to account for the leases encumbering the land as established by a local governmental entity as has previously been addressed.

BOTA never specifically ruled on the City's claim that the appraisal violated the USPAP. It did, however, accept the appraisal with certain adjustments. Finding that there were no violations of the USPAP, BOTA did not err in making no finding on the City's claim. The failure of Keller to take into account the leases on the land, as required by K.S.A. 79-503a, is an error that requires the case to be reversed and remanded.

Reversed and remanded.